May it please the Court, I'm Robert Jobe and I'm appearing today on behalf of the petitioner Sukhwinder Singh Patar. Two of the six reasons that the Board of Immigration Appeals gave to justify its adverse credibility finding need to be rejected right at the outset. Because in these two instances the Board did not give the petitioner an opportunity to address the alleged discrepancies. The first of these arises on page 162 of the record. Mr. Patar had testified that he joined the All-India Sikh Student Federation in April of 1991. And the Board discerned an inconsistency with that testimony, lines 9 and 10 of page 162 where he was talking about when he began to collect money for the federation. And he said, and the tenses are all wrong, but I do not collect any money before until September when I became a member. Now the government reads that as meaning I became a member in September. We read that as meaning I didn't collect money until September by which time I was a member of the federation. In our view we think it's reinforced by page 180 of the records, lines 23 and 24 where he says, again, and after being a member I used to collect funds for the federation. This is sort of a generic question, but it is so frustrating in reading these records when something turns on language like this that we're dealing through a translator. Exactly. Does the, this is just for other purposes. Now the tapes exist, I assume. Right. And somebody could go back and re-listen to them, presumably of a Punjabi speaker and tell us what that was actually said. At least theoretically. I mean we've been through that exercise a number of times. It's a four microphone recording and sometimes, oftentimes the Punjabi translation isn't picked up very well, but at least theoretically and in some cases it's possible to do that, yeah. And this is a very frustrating transcript because it's lacking any nuance whatsoever. And that's part of the And here when and after would make a huge difference since it's otherwise not all the acrobatical anyway. Precisely. Right. Yeah. But with regard to Excuse me, this is educating me. With your experience with these transcripts, is there ever a situation where the interpreter actually tries to communicate the emotion? That happens in district court. Yeah. So I'm wondering if that happens in the, before the immigration judge. In other words, you understand what I'm saying? No, I understand what you're saying. So if it's a dramatic statement or is it all flat? As a general rule, it's flat. You might have an occasional interpreter that is, that is a much better interpreter and is able to show the emotion. But as a general rule, no, in not, they're not interpreting at the same time the It's not simultaneous. It's not speaking either. No, it's not simultaneous. You know, the applicant will say a sentence and the interpreter will interpret that sentence and then, you know, so it breaks up the flow as well. So, you know, you can imagine this person's in the middle of telling a horrifying story about how this person was arrested, tortured, and he's breaking it up into individual sentences and he's stopping after each sentence so that it can be interpreted. Yeah, it really breaks the flow. Is this the interpretation often on the telephone? Pardon me? The interpreter often on the phone? Yes, oftentimes. Right. So these first two inconsistencies, in our view, they have to be rejected right at the outset because Mr. Patar was never given an opportunity to explain this is a case in point. The other one relates to his second arrest and how his shoulder was put back in place. He testified, and this is on page 123 of the record, that two persons held me from the sides. They made me stand next to the wall. And the judge found an inconsistency with a declaration that he had submitted to the asylum office, which says that the police reset my shoulder by slamming me against the wall, you know, forcing me to stand on the one hand next to the wall and slamming me against the wall. Again, though, no one raised this testimony as an issue until the judge rendered a decision. So it's not something that can be relied upon for an adverse credibility. You're telling us that the immigration judge in this case did not confront the Petitioner with the purported inconsistency. She waited until she rendered a decision, and then she pointed out this alleged inconsistency. Was the slammed language, that was in a declaration? That was a translation, too? Yes. Well, it's an English-language declaration, and obviously he doesn't speak English, so necessarily it's working through sighted hearing. The slammed or pushed him up against the wall, we don't know exactly what that's about. So is it your position then because you can look at it neutrally and because the immigration judge didn't give him an opportunity to explain that that is an inference against the government and in favor of him? I mean, unless he offers anywhere in the record an explanation later on, I'm a little bit confused about how to judge that testimony. The law of our circuit is that if the applicant isn't given an opportunity to explain an alleged discrepancy, it just can't be used against them. Now, I could see how there might be an exception to that rule if it's a glaring inconsistency that can't be overlooked. But here we're dealing with three separate declarations. You know, we're working from literally three separate declarations. This is an alleged discrepancy that's in one of those three, and it was never brought to his attention. It's one that could have easily been overlooked, and so it can't be used against him. And it's extremely nuanced. I mean, again, it could be simply linguistic. Exactly. The third discrepancy relates to the date of his first hearing. And this is laid out on page 167, 168 of the transcript. It arose when they were asking when the February 1992 election boycott occurred. He was asked, when did the boycott occur? He said in 1992, perhaps in the month of May. They asked him, do you recall whether the elections happened before the boycott, before or after your first arrest? And he begins to recall. He says, I was in custody at the time. It was the 18th of May. The next question is, well, what month? And then he corrects himself, and he says, no, not May. It was 18th of February, 1992. So without any prompting, you know, he's trying to remember when the boycott occurred. He says, well, it occurred while I was in custody. That was May. No. And he corrects himself and says February of 1992, and the judge used that against him. Again, there isn't an inconsistency. He's testifying in court. He's trying to recollect things that occurred, you know, nine years before. And he realized he made a mistake, and he quickly corrected it. It's not the basis of an adverse credibility finding. The next one relates to his membership in the Gurdwara. And, again, this is something that it doesn't seem like it can support an adverse credibility finding because it doesn't go to the heart of his claim. Why doesn't it go to the heart of the claim? Well, first off, there's no dispute that he's attending the Gurdwara. The real dispute here is, is he, quote, a member or not? Well, is he a member or does he have a position in the Gurdwara? Yes. In it, which would indicate that he has some political position which might be adverse to the government. You're talking about the organization. I'm talking about the Gurdwara in Fremont, California. This is where he said he was asked, well, first he presents a letter, and it's page 752 of the record. It's a form letter, as you can see, that the Gurdwara presents to Sikhs who are applying for asylum. Most of it is, like I said, it's just a form letter that they present to anybody who asks for such a letter. And it says this is to certify that the following person or persons is or are a member of this congregation and has been coming to the Gurdwara on a continuous basis. And then they write in his name. So then in court, he's asked the question, were you a member of the Fremont Gurdwara? And he said, I'm not a member, but I go there. How often do you go there? I go on the weekend if I'm home, and on the weekends I go there. So how often? How many weekends a month do you go? Every weekend I go. So he's saying I go every weekend, but he's saying I'm not really a member. And then this comes up again later. This is on page 156 of the administrative record, where he's confronted with this, fortunately, and they say you testified you weren't a member. And he says, well, I meant by that, I'm not a part of the committee, the management committee. I'm not a member of that committee. But I go. And he was consistent with that. So the real discrepancy is here, can he be punished for saying he goes to the Gurdwara every weekend, but saying he's not a member, because in his view, in order to be a member, you have to be part of the executive committee. I just want to go back to something that Judge Berzon said, because I think this is a very important point about what happens in a situation where you have, you know, six discrepancies like this, and you throw out five of them. Because, you know, these discrepancies, I don't think any of them can stand up. But let's say you can throw out five, you know, but one remains. It seems to me under Wang, there's some language in Wang that says, well, you have to uphold that adverse credibility finding. I just think that's absolutely wrong. I think the Second Circuit's approach is the correct one, and that is where you have a situation like this where, you know, you throw out five of these six adverse credibility findings, you have to think, well, can we be certain that if this thing is remanded back that the immigration judge is going to reach the same conclusion? And if we can't, if we can't be certain, we have to remand it to let the judge think that again. I think there are two points. One is that, and the second one is that if you have an immigration judge who is making that many mistakes, why are we believing him about anything? So it's a very strange business. But Wang does say if one stands, that can be the basis for denying relief, doesn't it? But I think Wang should be read more as to the facts, limited to its facts, because the one factor in that case that they found supported by evidence was a whopper. It was a huge advert, you know, a huge factor. It's more of a harmless error rule, essentially. Pardon me, Your Honor? It's essentially a harmless error rule. Exactly. That given what the actual findings were, this one would have been enough. Precisely. Not any one would have been enough. Is there no distinction between those that you say were thrown out in Wang and whether or not any of the inconsistencies here can be used against the petitioner? In other words, what I'm saying is that you can throw something out because it is illogical. Right. But in this case, are the ones that you wish to throw out, the first three or four, are they illogical? Well, some are absolutely illogical. And like, for example, saying that he should be found not credible because he first said he was arrested in May and then he quickly corrected it and said February. Others can't be used against him under the law of the circuit because he's never been given an opportunity to explain. But the bottom line is, if the judge says, I've got six reasons to say you're not credible, and five of those are based on either legal or factual error, and the sixth one, well, there's some support for it. We don't know what the immigration judge would do on remand if she realized that five of the six findings that she made were, in fact, legally erroneous. And I don't think it's appropriate for this Court, then, to say, well, because she made an adverse credibility finding overall, we should just uphold that. Because in my view, what that does is it takes the discretion away from the immigration judge. Because for all we know, when this goes back to the judge, she's going to look at it differently in view of the fact that she realizes now that she made five errors, and she could come to an altogether different decision. You're a little over your time. We'll give you a little time for rebuttal. Thank you, Your Honor. I hear from the government at this time, Attorney General. Mr. Nichols. Thank you, Your Honor. Mr. Nichols, on behalf of the Respondent. I want to start with perhaps the last question in the case, just because I think we're now on common ground, and that is that Petitioner has dropped what I think was the suggestion in his brief that this Court can actually determine that the Petitioner is asylum eligible if you reverse the adverse credibility determination. That's clearly wrong. And what Petitioner's counsel just said is that the appropriate course in that event with which we disagree, of course, is a remand. Well, strangely enough, you didn't argue that. Yeah. I must confess, Your Honor, that I was not involved in this brief. Oh, I see. And our view standing here is that. I was reading it, saying, well, what happened to Ventura? It always shows up at the end of the brief. Your Honor, I think that Ventura is quite clearly the law, and I think both parties are in agreement that the appropriate course, if you were to disagree with the IJ and Board's adverse credibility determination, would be a remand. However, I, of course, don't agree that that's the appropriate course. I think it's important to start here with the fact that this Court has recognized and I'd like to quote Manenbau, I believe that's how you pronounce the case, that this Court grants special deference to the IJ's eyewitness observations regarding demeanor evidence. And this goes to credibility, because the IJ is the person sitting there observing whether the Petitioner appears to be testifying credibly or not. And the IJ specifically made two findings with respect to credibility and demeanor. The IJ found, and this is the IJ's opinion at 16 to 17, Administrative Record 82 to 83, quote, on cross-examination, the Respondent's testimony was non-responsive and evasive. He repeatedly testified about matters unrelated to the questions and often didn't answer questions at all. That's one place where the IJ notes that he believed the Petitioner was evasive and non-responsive. And that's supported by what? Well, there are a number of passages. If you read the transcript, Your Honor, I'm happy to read one or two to you here. Just give us the page number. Sure. There are a number of places throughout the transcript. And in order, I would refer you to Administrative Record 183 to 184, where the judge is actually asking questions of Mr. Patar and expresses concern that Mr. Patar is avoiding the question or not even answering it. A second example is Administrative Record 169, same thing. And then another example, Your Honor, is Administrative Record 164. Now, that, I must admit, is a comment by counsel. But again, if you read the colloquy between Mr. Patar and counsel for the government, it's fairly apparent that he wasn't answering the questions. Now, this is not a translation problem, I don't believe, because Mr. Patar's wife later testified in the hearing through a translator and there was no such problem. This is a problem with Mr. Patar. What do we do with the situation where in rendering the decision, the I.J. says the witness, the Petitioner was unresponsive in the following circumstance, understanding that when the I.J. says that, she's had no opportunity to review the transcript. She was there, of course, for the hearing. But this is not United States District Court where there may be real-time transcription where somebody can bring the exact testimony up. What happens when there's a generalized statement and then we go to the actual transcript and it doesn't support it? Well, I think that might be a problem in a hypothetical situation. I don't think it's true here because I think if you go look at the transcript sites I gave you, it's quite clear that Petitioner was, in fact, not answering the questions, was, in fact, nonresponsive. But it's not clear to me that the I.J. has to actually review the transcript later on, the cold record, to ---- Well, that's Star Wars stuff because we all know they don't. Right. But what I'm saying is not only did it ---- How long have you been arguing these cases? I've been at the government for a year and a half, Your Honor. Have you ever seen a case that indicated that the I.J. had actually read the transcript? No. But what I'm suggesting is ---- Well, it's the nature of the transcription, the nature of the recording and the administrative devices that are given I.J.'s, right? Sure. But the assumption in your question is that the I.J. should do that in determining whether ---- That's not my assumption at all. I understand what these folks have to labor under. They're extraordinarily difficult circumstances. But I.J.'s don't have the opportunity to go back and review the transcript. Perhaps they should, but they don't. Yeah. And what I'm disagreeing with is, at least in the most extreme, at least with respect to something that's not the most extreme case, is that the I.J. should do that with respect to a question of whether the Petitioner was nonresponsive. The I.J. is witnessing the testimony. I'm not suggesting, Counselor, whether they should or shouldn't. I'm just asking. You say it's hypothetical. That may well be the case. But assume this is a hypothetical question. If the I.J. makes a statement like that, the witness was responsive in these respects, and then we go back with the benefit of the actual transcript, and it doesn't support the I.J.'s statement, what do we do? Well, I think, first of all, your standard of review would be your typical one, and that is, could no reasonable person have found what the I.J. found? But you have to grant particular deference, I think, because you don't just have the cold record in front of you. You have to assume that the I.J.'s witnessing of the witness's demeanor is relevant. And the person testifying may have been nonresponsive or responsive in what he or she said, but how he or she said it matters, too. Isn't her standard substantial evidence in the record as a whole? It is, but when we're – with respect to fact evidence, I mean, it's pretty clear, I think, that you have to determine that no reasonable person could have decided the way the I.J. did. And I think with respect to factual determinations, like whether – with respect to a particular line of questioning, the Petitioner was responsive or not. And the substantial evidence standard is the general one, but I think the Court has been very clear saying that with respect to particular questions, the question is whether any reasonable person would have been compelled to have reached a conclusion different from the I.J. So I don't think – and in particular in this case, I do not think it can be claimed that the I.J. was wrong, at least applying that standard of review, to have concluded, particularly where the I.J. was there in person, that the Petitioner was nonresponsive and evasive. Let's take a particular example. One of the things the I.J. relied upon here, if I'm not mistaken, was an alleged inconsistency as to the status of the Petitioner's membership in the AISS. That's right. And whether the Petitioner was a district secretary or merely a member. Yeah. Can you show me in the Petitioner's testimony where there's an inconsistency on this particular issue? Well, I think we're shifting slightly, but just so we're clear, there's the question of whether he was generally nonresponsive or the I.J. generally believed him to be. I understand that. Now we're talking about specific inconsistencies, right? And here, I think it's an inconsistency among three different kinds of evidence. First, you have a letter from this Foundation. The letter says that he had been elevated to the post of propaganda secretary of the district unit and had taken an, quote, active role in our struggle. Then the Petitioner, at administrative record 154 to 155, and then again later at 194, 95, sort of shifts around. There's a suggestion that he wasn't ever a propaganda secretary at any level. Then there's a suggestion that, yes, in fact, he was at the district level, but he reserved or he essentially only worked at the village level. And then there was the suggestion that he was only the propaganda secretary at the village level. First of all, if he really wanted to lie, he would have agreed. He knew he had this letter, and he would have said, yes, that's what I was. But he didn't do that. Instead, there seemed to be a more nuanced explanation. Yeah, I don't think the effect of, yes, they gave me that title, but I wasn't able to carry it out because my father wouldn't let me. That's essentially what he said. He does say that in some respects, though his wife then contradicts him. His wife says at administrative record 219, to her knowledge, he never had any position in the Federation other than as a member. So if you credit the wife in any respect, or at the very least, you have a disagreement between the wife and the husband about what the husband was up to. No, you have a disagreement about what she knew. That's the case. But I don't think that you could reverse the I.J.'s determination on credibility by substituting that judgment or saying that, well, it's probably the case that the wife lacked knowledge. Back to the question I asked at first. Yeah. Is there an inconsistency? Yeah. Excuse me. Let me finish. Is there an inconsistency in the petitioner's testimony on this issue, whether he was just a member or he held the position of district secretary? Yes. For example, this is at 155. According to this, this is the question. According to this, this letter, the end of the second full paragraph, the petitioner was elevated to the post of propaganda secretary of the district unit. Were you the propaganda secretary of the district unit? Aye, aye. They were saying so. But I did not leave my village because I had a lot of work to do. How is that inconsistent? I mean, go ahead. Yeah. If you then go to the page before that, I'm sorry, at 194 to 195, he says at 17, I was not the secretary. I would only work at the village level. Now that's what he said throughout. Well, he said he was the secretary at the district level, but he worked at the village level. They were calling him that, but as a functional matter, he wasn't doing it. Well, I mean, that's one interpretation of the record. And that's one inconsistency. Imagine that you rejected that as an inconsistency. We still have a number of others. I don't think that this eliminating this one inconsistency would be enough to say that a remand is necessary. And I know I'm out of time. I could walk through the others. I'd be happy to. I don't know if that would be helpful. Thank you, Your Honor. Okay. Thank you for coming in, Mr. Finkel. Appreciate it. Absolutely. Put a minute on the clock, please, for Roberta. I just want to make two very quick points. I mean, first, I don't dispute that demeanor findings are entitled to greater deference, but nonresponsiveness is not a demeanor finding. That's something that you can easily, a reviewing court can examine the record and determine whether somebody is being responsive or not. And the law in this circuit is clear that in order for a nonresponsiveness finding to be upheld, the immigration judge has to identify specific instances of nonresponsiveness. Well, but the examples that we were just given, he did look somewhat unresponsive. I mean, he was answering questions that weren't attached to what he was saying. And I think there is some nonresponsiveness, but if you read through the transcript, unquestionably, a lot of that nonresponsiveness is because of interpretation issues. I mean, there are complete questions and answers that are But at that point, for example, he was asked one of the points about the hospital room. And he said, well, why didn't you answer that question? What does your answer have to do with the question? And he essentially said something like, well, I couldn't really answer your question because I don't know the answer. But he didn't say that the first time. He said something else. The hospital records, Your Honor, is that what you're referring to? Yeah, 120. That particular passage to me, it seemed obvious that there was a miscommunication because there's a question that's being answered, and then he's responding with how much money his father had to pay. Right. I mean, it seemed obvious to me that there was a miscommunication or a mistranslation. What about the wife's testimony? Why is that testimony, why should we consider that as not credible? Why wouldn't she have known? And was she called by him or was she called by the government? She was called, I think, by him. But the wife, she actually testified that she didn't know exactly what he was doing. She wasn't really kept abreast. And you're right. What's interesting about this case is that the immigration judge didn't make any adverse credibility finding with respect to the wife. And I'm not sure how that enters into the case because she corroborated much of what he said about him being arrested. Should she have known, though? Should she have known? It's a cultural thing, Your Honor. In India, these women, in all honesty, I mean, I've been invited to dinner at a Sikh man's house, and the woman doesn't even sit down to dinner with us. She cooks, she brings us the food, that's it. I mean, it's not like she's involved in the day-to-day activities of her husband. What I'm saying was I didn't actually do anything. Precisely. Therefore, she wouldn't have observed him doing anything because he didn't actually do it. My reading of that particular thing is exactly the same as yours. He was elevated. They told him, we want you to do this job. But he just never did it. He wanted to stay home and tend to the farm. And insofar as their records might, the Federation letter might have an inaccuracy in it, I think it's important that you look at page 272 of the record. This is a document that the government itself presented based on their investigation in India, and they say we've learned that the organization, the AISSF, does not have an accurate accounting of its members. It's not unlikely that the letter that they're going to produce might have an inaccuracy like that. Okay. Thank you both for your argument. The case just argued will be submitted for decision.
judges: B. Fletcher, Berzon, Trager